Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEX WOLK, derivatively on behalf of, SPLUNK INC., <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS S. MERRITT, JASON E. CHILD, SARA J. BAACK, SEAN BOYLE, MARK T. CARGES, JOHN G. CONNORS, PATRICIA B. MORRISON, STEPHEN G. NEWBERRY, GRAHAM V. SMITH, ELISA A. STEELE, and SRI VISWANATH, <br><br> Defendants, <br><br> and <br><br> SPLUNK INC., <br><br> Nominal Defendant. | Case No.: <br><br> DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Alex Wolk ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Splunk Inc. ("Splunk" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Douglas S. Merritt ("Merritt"), Jason E. Child ("Child"), Sara J. Baack ("Baack"), Sean Boyle ("Boyle"), Mark T. Carges ("Carges"), John G. Connors ("Connors"), Patricia B. Morrison ("Morrison"), Stephen G. Newberry ("Newberry"), Graham V. Smith ("Smith"), Elisa A. Steele ("Steele"), and Sri Viswanath ("Viswanath") (collectively, the "Individual Defendants," and together with Splunk, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Splunk, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Splunk, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Splunk's directors and officers from August 26, 2020 through December 2, 2020, both dates inclusive (the "Relevant Period").

2.     Splunk is a California-based software company that specializes in data analysis software to aid in enterprise management. It sells a variety of software packages to enterprise customers, and has over 19,400 customers in over 130 countries including more than ninety of the Fortune 100 companies. While the Company used to sell software on a perpetual basis, the Company discontinued its perpetual

licenses in November 2019 and now primarily generates revenue from licensing its software for a term, with the hope of renewals, as well as selling subscriptions to its cloud services.[1] The Company's flagship product offering is Splunk Enterprise, "a real-time data platform, comprised of collection, indexing, search, reporting, analysis, alerting, monitoring and data management capabilities."

3.       As part of this switch from perpetual to term licenses and cloud services subscriptions, the Company was trying to close deals with its existing customers, in an attempt to get them to renew their commitments under the new, recurring price structure. However, many of these existing customers, including some of the Company's largest customers, did not want to switch from a perpetual license to one with a recurring cost. As a result of their dissatisfaction with this new pricing model, many customers chose not to renew.

4.       Despite the difficulties the Company was having in securing these deals with its existing customers, at the start of the Relevant Period, on August 26, 2020, Splunk issued a press release and held an earnings conference call in which it announced optimistic financial guidance for the third quarter of fiscal year 2021.[2]

5.       One month later, on September 24, 2020, the Company announced that its then-President, Worldwide Field Operations, Susan St. Ledger, (effectively, the head of Splunk's sales team) suddenly resigned from her position and would be departing the Company for a new job. Notably, Splunk did not disclose any additional motivation for the parting of ways.

6.       This was followed on October 21, 2020, only ten days prior to the end of the third fiscal quarter of 2021, by another earnings call with investors where Defendants Merritt and Child represented that the Company was on track to meet the guidance issued on August 26, 2020. Moreover, thanks to certain "tailwind[s]," Defendants Merritt and Child highlighted that the Company expected to meet its growth objectives and that this effort was aided by "the significant and growing customer renewal base."

---

[1] The Company continues to generate some revenue from its perpetual licenses as maintenance and support on those licenses is sold separately.
[2] The Company's fiscal years end on January 31, so the third quarter of fiscal year 2021 is the three-month period ended October 31, 2020.

7.     However, the truth was that the Company was experiencing great difficulty in securing renewals, especially with its largest and most important customers, which stemmed in part with customer dissatisfaction with the Company's new pricing plan. Many of these large customers were refusing to renew under the new pricing plan, and this development rendered the optimistic revenue guidance that was provided, and reaffirmed, by the Individual Defendants and by the Company to be likely unobtainable at the time it was offered, and then affirmed.

8.     The truth emerged on December 2, 2020, when, after the market had closed, Splunk released its financial results for the fiscal quarter ended October 31, 2020. The results greatly trailed the Company's previous guidance for the quarter, with revenue for the quarter down 11% year-over-year and falling 9% below the median of the range provided in the August 26, 2020 guidance, which had been reaffirmed on October 21, 2020.

9.     On an earnings call with investors, also on December 2, 2020, Defendants Merritt and Child admitted that this failure was caused by the failure to close renewal deals with the some of the Company's largest customers. Securities analysts rightly pointed out that this explanation "blindsided" investors given the statements made on the "upbeat analyst day 10 days prior to the quarter close[.]"

10.    On this news, the share price of the Company's common stock dropped $47.88, from $205.91 per share at the close of trading on December 2, 2020, to $158.03 per share at the close of trading on December 3, 2020, a drop of approximately 23.3%.

11.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Splunk's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Splunk was facing difficulty in obtaining contract renewals due to customer dissatisfaction, particularly from large customers, with a newly-implemented price plan; (2) as part of this customer dissatisfaction, several of the Company's largest customers in fact did not renew their contracts with Splunk; (3) due to the foregoing, Splunk was trailing the Company's stated financial goals and could not meet the financial

guidance that it had issued to investors; (4) therefore, during the Relevant Period, when the statements at issue were made, there was no reasonable basis to support the statements touting the Company's financial results and providing an optimistic outlook for the Company's fiscal quarter ended October 31, 2020; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Splunk's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     Furthermore, during the Relevant Period, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining proceeds of over $12.1 million.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and the CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Splunk's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with principal executive offices in this District and conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

24.     Venue is proper in this District because Splunk and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Splunk common stock. Plaintiff has continuously held Splunk common stock at all relevant times. Plaintiff is a citizen of Missouri.

### Nominal Defendant Splunk

26.     Splunk is a Delaware corporation with its principal executive offices located at 270 Brannan Street, San Francisco, California 94107. Splunk's shares trade on NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "SPLK."

### Defendant Merritt

27.     Defendant Merritt has served as the Company's President, CEO, and as a Company director since November 2015. Previously, he served as the Company's Senior Vice President of Field Operations from 2014 to 2015. According to the Company's Schedule 14A filed with the SEC on April 28, 2020 (the "2020 Proxy Statement"), as of March 31, 2020, Defendant Merritt beneficially owned 50,197 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Merritt owned over $6.3 million worth of Splunk common stock.

28.     For the fiscal year ended January 31, 2021, Defendant Merritt was entitled to his base salary of $850,000 with an additional annual target cash bonus of up to $1,062,500. In addition, he was entitled to substantial stock awards and other compensation.[3]

29.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Merritt made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 8/31/2020 | 13,709 | $218.36 | $2,993,497.24 |
| 9/14/2020 | 14,634 | $186.92 | $2,735,387.28 |
| 9/16/2020 | 18,862 | $183.92 | $3,469,099.04 |

---

[3] By way of example, for the fiscal year ended January 31, 2020, Defendant Merritt received $14,100,955 in stock awards and $60,565 in all other compensation.

Thus, in total, before the fraud was exposed, he sold 47,205 Company shares on inside information for which he received nearly $9.2 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

30.     The Company's 2020 Proxy Statement stated the following about Defendant Merritt: *Douglas Merritt* has served as our President, CEO and a member of our Board since 2015. Mr. Merritt served as our Senior Vice President of Field Operations from 2014 to 2015. Prior to joining us, he served as Senior Vice President of Products and Solutions Marketing at Cisco Systems, Inc., a networking company, from 2012 to 2014. From 2011 to 2012, he served as Chief Executive Officer of Baynote, Inc., a behavioral personalization and marketing technology company. Previously, Mr. Merritt served in a number of executive roles and as a member of the extended Executive Board at SAP A.G., an enterprise software company, from 2005 to 2011. From 2001 to 2004, Mr. Merritt served as Group Vice President and General Manager of the Human Capital Management Product Division at PeopleSoft Inc., a software company (acquired by Oracle Corporation). He also co-founded and served as Chief Executive Officer of Icarian, Inc., a cloud-based company (since acquired by Workstream Corp.), from 1996 to 2001. Mr. Merritt holds a B.S. from The University of the Pacific in Stockton, California.

31.     Upon information and belief, Defendant Merritt is a citizen of California.

**Defendant Child**

32.     Defendant Child has served as the Company's Senior Vice President and CFO since May 2019. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Child beneficially owned 12,431 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Child owned approximately $1.6 million worth of Splunk stock.

33.     For the fiscal year ended January 31, 2021, Defendant Child was entitled to his base salary of $485,000 and his annual target cash bonus of up to $388,000. In addition, he was entitled to stock awards and other compensation.[4]

34.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Child made the following sales of company stock, and made no purchases of Company stock:

---

[4] By way of example, for the fiscal year ended January 31, 2020, Defendant Child received stock awards of $16,294,280 and other compensation of $84,623.

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| 9/4/2020 | 2,469 | $205.00 | $506,145.00 |
| 9/14/2020 | 4,372 | $186.92 | $817,214.24 |
| 9/18/2020 | 1,017 | $176.92 | $179,927.64 |
| 10/1/2020 | 2,470 | $190.00 | $469,300.00 |
| 10/8/2020 | 1,017 | $210.00 | $213,570.00 |

Thus, in total, before the fraud was exposed, he sold 11,345 Company shares on inside information for which he received nearly $2.2 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35.     The Company's 2020 Proxy Statement stated the following about Defendant Child: *Jason Child* has served as our Senior Vice President and Chief Financial Officer since 2019. Prior to joining us, Mr. Child served as Chief Financial Officer at Opendoor Labs Inc., an online real estate marketplace, from 2017 to 2019. From 2015 to 2016, Mr. Child was Chief Financial Officer at AliphCom, Inc. (d/b/a Jawbone), a consumer technology and wearable products company. Mr. Child served as Chief Financial Officer at Groupon, Inc., an e-commerce company, from 2010 to 2015. Previously, he spent over 11 years leading various global finance teams at Amazon.com, Inc., an e-commerce and cloud computing company. Mr. Child began his career at Arthur Andersen LLP. He holds a B.A. from the University of Washington.

36.     Upon information and belief, Defendant Child is a citizen of Idaho.

**Defendant Baack**

37.     Defendant Baack has served as a Company director since September 2017. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Baack beneficially owned 9,888 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Baack owned over $1.2 million worth of Splunk common stock.

38.     For the fiscal year ended January 31, 2021, Defendant Baack was entitled to $50,000 in fees earned or paid in cash for her service as a Company director, $5,000 in fees earned or paid in cash for her service as a member of the Nominating and Corporate Governance Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for her service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

39.     The Company's 2020 Proxy Statement stated the following about Defendant Baack: *Sara Baack* has served as a member of our Board since 2017. Since April 2019, Ms. Baack has served as Chief Product Officer of Equinix, Inc., a global interconnection and data center company. Previously, she was Equinix's Chief Marketing Officer from 2012 to April 2019. Prior to joining Equinix, Ms. Baack served in various executive positions at Level 3 Communications Inc., a provider of integrated communications services, most recently as Senior Vice President, Voice Services from 2007 to 2012 and in other leadership positions in the company from 2000 to 2007. Prior to Level 3, she worked in financial services investing private equity for PaineWebber Capital (since acquired by UBS Group AG). Ms. Baack holds a B.A. from Rice University and an M.B.A. from Harvard Business School.

40.     Upon information and belief, Defendant Baack is a citizen of Colorado.

**Defendant Boyle**

41.     Defendant Boyle has served as a Company director since August 26, 2020. He also serves as a member of the Audit Committee.

42.     For the fiscal year ended January 31, 2021, Defendant Boyle was entitled to a prorated portion of $50,000 in fees earned or paid in cash for his service as a Company director, $10,000 in fees earned or paid in cash for his service as a member of the Audit Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for his service as a Company director, and also an initial stock award valued at $350,000 for him having joined the Board, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

43.     The Company's website states the following about Defendant Boyle:

Sean Boyle has served as a member of our board of directors since 2020. He brings more than two decades of finance and capital markets experience, financial planning and operations, as well as management and strategy. He previously served in various roles at Amazon Web Services, Inc., a cloud computing and infrastructure company, between 2006 and 2020, including as Vice President of Investor Relations, Chief Financial Officer, and most recently as Vice President. Mr. Boyle holds a B.Com. (Hons) and an M.B.A. from the University of Windsor.[5]

44.     Upon information and belief, Defendant Boyle is a citizen of Washington.

---

[5] https://www.splunk.com/en_us/about-splunk/leadership.html#tabs/tabparsystabsBoardofDirectors1. Last visited February 15, 2021.

Verified Shareholder Derivative Complaint

**Defendant Carges**

45.     Defendant Carges has served as a Company director since September 2014. He also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Carges beneficially owned 14,632 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Carges owned over $1.8 million worth of Splunk common stock.

46.     For the fiscal year ended January 31, 2021, Defendant Carges was entitled to $50,000 in fees earned or paid in cash for his service as a Company director, $10,000 in fees earned or paid in cash for his service as a member of the Audit Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for his service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

47.     The Company's 2020 Proxy Statement stated the following about Defendant Carges:
*Mark Carges* has served as a member of our Board since 2014. Mr. Carges previously served as the Chief Technology Officer of eBay Inc., an e-commerce company, from September 2009 to September 2014. From September 2009 to November 2013, he also served as eBay's Senior Vice President, Global Products, Marketplaces. From September 2008 to September 2009, he served as eBay's Senior Vice President, Technology. From November 2005 to May 2008, Mr. Carges served as Executive Vice President, Products and General Manager of the Business Interaction Division of BEA Systems, Inc., a software company (acquired by Oracle Corporation). Mr. Carges has served as a member of the board of directors of Veeva Systems Inc., a provider of industry cloud solutions for the global life sciences industry, since 2017. Mr. Carges previously served on the board of directors of Rally Software Development Corp., a provider of cloud-based solutions for managing software development (acquired by CA Technologies), from 2011 to 2015. Mr. Carges holds a B.A. from the University of California, Berkeley and an M.S. from New York University.

48.     Upon information and belief, Defendant Carges is a citizen of California.

**Defendant Connors**

49.     Defendant Connors has served as a Company director since July 2007. In addition, he serves as the Chair of the Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Connors beneficially owned 68,484 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Connors owned over $8.6 million worth of Splunk stock.

50.     For the fiscal year ended January 31, 2021, Defendant Connors was entitled to $50,000 in fees earned or paid in cash for his service as a Company director, $25,000 in fees earned or paid in cash for his service as the Chair of the Audit Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for his service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

51.     The Company's 2020 Proxy Statement stated the following about Defendant Connors: *John Connors* has served as a member of our Board since 2007. Since 2005, Mr. Connors has been a managing partner at Ignition Partners, LLC, a venture capital firm. Prior to joining Ignition Partners, Mr. Connors served in various management positions at Microsoft Corporation, a technology company, from 1989 to 2005, including most recently as Senior Vice President and Chief Financial Officer from 1999 to 2005. Mr. Connors has served as a member of the board of directors of NIKE, Inc., a designer, marketer and distributor of authentic athletic footwear, apparel, equipment and accessories, since 2005. Mr. Connors holds a B.A. from the University of Montana.

52.     Upon information and belief, Defendant Connors is a citizen of Washington.

**Defendant Morrison**

53.     Defendant Morrison has served as a Company director since April 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Morrison beneficially owned 27,823 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Morrison owned over $3.5 million worth of Splunk common stock.

54.     For the fiscal year ended January 31, 2021, Defendant Morrison is entitled to $50,000 in fees earned or paid in cash for her service as a Company director, $12,500 in fees earned or paid in cash for her service as the Chair of the Nominating and Corporate Governance Committee, $10,000 in fees earned or paid in cash for her service as a member of the Audit Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for her service as a Company

director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

55.     The Company's 2020 Proxy Statement stated the following about Defendant Morrison:

*Patricia Morrison* has served as a member of our Board since 2013. Ms. Morrison was Executive Vice President, Customer Support Services and Chief Information Officer at Cardinal Health, Inc., a provider of healthcare services, from 2009 to 2018. Prior to joining Cardinal Health, Ms. Morrison was Chief Executive Officer of Mainstay Partners, a technology advisory firm, from 2008 to 2009, and Executive Vice President and Chief Information Officer at Motorola, Inc., a designer, manufacturer, marketer and seller of mobility products, from 2005 to 2008. Her previous experience also includes Chief Information Officer of Office Depot, Inc. and senior-level information technology positions at PepsiCo, Inc., The Quaker Oats Company, General Electric Company and The Procter & Gamble Company. Ms. Morrison has served as a member of the board of directors of Baxter International Inc., a global medical products company, since 2019. Ms. Morrison previously served as a member of the board of directors of Aramark, a global provider of food, facilities and uniform services, from 2017 to 2019. Ms. Morrison holds a B.A. and B.S. from Miami University in Oxford, Ohio.

56.     Upon information and belief, Defendant Morrison is a citizen of Florida.

**Defendant Newberry**

57.     Defendant Newberry has served as a Company director since January 2013. He also serves as the Chair of the Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Newberry beneficially owned 38,121 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Newberry owned over $4.8 million worth of Splunk common stock.

58.     For the fiscal year ended January 31, 2021, Defendant Newberry is entitled to $50,000 in fees earned or paid in cash for his service as a Company director, $20,000 cash in fees earned or paid in cash for his service as the Chair of the Compensation Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for his service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

59.     The Company's 2020 Proxy Statement stated the following about Defendant Newberry:
*Stephen Newberry* has served as a member of our Board since 2013. Mr. Newberry served as a director of Lam Research Corporation, a supplier of wafer fabrication equipment and services, from 2005 to 2019, and served as the Chairman of the board of Lam Research

from 2012 to 2019. He served as Lam Research's Chief Executive Officer from 2005 to 2011, President from 1998 to 2010, and Chief Operating Officer from 1997 to 2005. Prior to joining Lam Research, Mr. Newberry held various executive positions at Applied Materials, Inc., a provider of manufacturing solutions for the semiconductor, flat panel display and solar industries. Mr. Newberry previously served on the board of directors of Nanometrics Incorporated, a provider of process control metrology and inspection systems, from 2011 to 2015. Mr. Newberry holds a B.S. from the United States Naval Academy and is a graduate of the Program for Management Development at Harvard Business School.

60.     Upon information and belief, Defendant Newberry is a citizen of Montana.

**Defendant Smith**

61.     Defendant Smith has served as a Company director since August 2011 and as the Chairman of the Board since March 2019. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Smith beneficially owned 44,690 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Smith owned over $5.6 million worth of Splunk common stock.

62.     For the fiscal year ended January 31, 2021, Defendant Smith is entitled to $50,000 in fees earned or paid in cash for his service as a Company director, $50,000 in fees earned or paid in cash for his service as the Chairman of the Board, $10,000 in fees earned or paid in cash for his service as a member of the Audit Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for his service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

63.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Smith made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| 9/16/2020 | 3,000 | $183.98 | $551,940.00 |
| 9/30/2020 | 500 | $190.00 | $95,000.00 |
| 10/6/2020 | 500 | $200.00 | $100,000.00 |

Thus, in total, before the fraud was exposed, he sold 4,000 Company shares on inside information for which he received $746,940. His insider sales made with knowledge of material nonpublic information

before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

64.     The Company's 2020 Proxy Statement stated the following about Defendant Smith: *Graham Smith* has served as a member of our Board since 2011 and Chair since 2019. Mr. Smith was Executive Vice President at salesforce.com, inc., a provider of enterprise cloud computing software, in 2015. Previously he was salesforce's Executive Vice President, Finance from 2014 to 2015, Executive Vice President and Chief Financial Officer from 2008 to 2014, and Executive Vice President and Chief Financial Officer Designate from 2007 to 2008. Prior to joining salesforce, Mr. Smith served as Chief Financial Officer at Advent Software Inc., a portfolio accounting software company, from 2003 to 2007. Mr. Smith has served as a member of the board of directors of BlackLine, Inc., a provider of cloud-based solutions for finance and accounting since 2015, and Slack Technologies, Inc., a provider of cloud-based professional collaboration tools, since 2018. Mr. Smith previously served on the board of directors of Citrix Systems, Inc., an enterprise software company, from 2015 to 2018, MINDBODY, Inc., a cloud-based wellness services marketplace (acquired by Vista Equity Partners), from 2015 to 2019, and Xero Limited, an online accounting software company, from 2015 to 2020. Mr. Smith holds a B.Sc. from Bristol University in England and qualified as a chartered accountant in England and Wales.

65.     Upon information and belief, Defendant Smith is a citizen of California.

**Defendant Steele**

66.     Defendant Steele has served as a Company director since September 2017. She also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Steele beneficially owned 9,888 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Steele owned over $1.2 million worth of Splunk common stock.

67.     For the fiscal year ended January 31, 2021, Defendant Steele is entitled to $50,000 in fees earned or paid in cash for her service as a Company director, $10,000 in fees earned or paid in cash for her service as a member of the Compensation Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for her service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

68.     The Company's 2020 Proxy Statement stated the following about Defendant Steele:

*Elisa Steele* has served as a member of our Board since 2017. Ms. Steele previously served as Chief Executive Officer of Namely, Inc., a financial and human capital management software company, from 2018 to 2019. Prior to joining Namely, Ms. Steele served as Chief Executive Officer and President of Jive Software, Inc., a collaboration software company (acquired by Aurea Software, Inc.), from 2015 to 2017. From 2014 to 2015, she served in various executive positions at Jive Software, including President; Executive Vice President, Strategy and Chief Marketing Officer; and Executive Vice President, Marketing and Products. Prior to joining Jive Software, Ms. Steele served as Chief Marketing Officer and Corporate Vice President, Consumer Apps & Services at Microsoft Corporation, a worldwide provider of software, services and solutions, and Chief Marketing Officer of Skype, an Internet communications company, from 2012 to 2014. Ms. Steele also has held executive leadership positions at Yahoo! Inc. and NetApp, Inc. Ms. Steele has served as a member of the board of directors of Cornerstone OnDemand, Inc., a learning and human capital management software company, since 2018. Ms. Steele holds a B.S. from the University of New Hampshire and an M.B.A. from San Francisco State University.

69.     Upon information and belief, Defendant Steele is a citizen of California.

**Defendant Viswanath**

70.     Defendant Viswanath has served as a Company director since March 2019. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Viswanath beneficially owned 2,815 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $126.23, Defendant Viswanath owned over $355,337 worth of Splunk common stock.

71.     For the fiscal year ended January 31, 2021, Defendant Viswanath is entitled to $50,000 in fees earned or paid in cash for his service as a Company director, $5,000 in fees earned or paid in cash for his service as a member of the Nominating and Corporate Governance Committee, stock awards having had an award value of $250,000 on the date of the annual meeting of stockholders for his service as a Company director, and, potentially, additional, discretionary stock awards which the 2020 Proxy Statement states the Board "may grant a non-employee director . . . at any time and for any reason[.]"

72.     The Company's 2020 Proxy Statement stated the following about Defendant Viswanath:

*Sri Viswanath* has served as a member of our board of directors since 2019. Since 2016, Mr. Viswanath has served as Chief Technology Officer at Atlassian Corporation Plc, a provider of team collaboration and productivity software. Prior to joining Atlassian, Mr. Viswanath served as Senior Vice President of Engineering and Operations from April 2013 to October 2014 and Chief Technology Officer from October 2014 to January 2016 at Groupon, Inc., an e-commerce company. From 2012 to 2013, he served as Vice President

of Research and Development for mobile computing at VMware, Inc., a provider of cloud and virtualization software and services. His previous experience also includes senior-level product positions at Glam Media, Inc. and Ning Inc. (acquired by Glam Media). He began his career in engineering roles at Sun Microsystems, Inc. Mr. Viswanath previously served on the board of directors of SendGrid, Inc., a provider of a cloud-based customer communication platform (acquired by Twilio Inc.), from 2017 to 2019. Mr. Viswanath holds a B.E. from Bangalore University, and a M.S. from each of Clemson University and Stanford University.

73.     Upon information and belief, Defendant Viswanath is a citizen of California.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

74.     By reason of their positions as officers, directors, and/or fiduciaries of Splunk and because of their ability to control the business and corporate affairs of Splunk, the Individual Defendants owed Splunk and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Splunk in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Splunk and its shareholders so as to benefit all shareholders equally.

75.     Each director and officer of the Company owes to Splunk and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Splunk, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

77.     To discharge their duties, the officers and directors of Splunk were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Splunk, the absence of good faith on their part, or a reckless disregard for their duties to the

Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Splunk's Board at all relevant times.

79.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

80.     To discharge their duties, the officers and directors of Splunk were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Splunk were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Splunk's own Code of Business Conduct and Ethics (the "Code of Conduct"), policies, and corporate governance;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Splunk conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Splunk and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Splunk's operations would comply with all applicable laws and Splunk's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

81.     Each of the Individual Defendants further owed to Splunk and the shareholders the duty of loyalty requiring that each favor Splunk's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

82.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Splunk and were at all times acting within the course and scope of such agency.

83.     Because of their advisory, executive, managerial, and directorial positions with Splunk, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Splunk.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets, abuse of control, and gross mismanagement.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Splunk was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Splunk and was at all times acting within the course and scope of such agency.

## SPLUNK'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

90.     The Company's Code of Conduct states "[a]ll employees, officers and board members are required to read, understand, and follow the Code and to raise any concerns or potential violations of the Code. Failure to do so may result in disciplinary action up to and including termination of your relationship with Splunk, in accordance with applicable local law."

91.     Under the section titled, "The Code and the Law," the Code of Conduct states the following, in relevant part:

> As we pursue our mission of making machine data accessible, usable and valuable to everyone around the world, we are subject to many different laws internationally, including those relating to employment, governance, compliance, and data privacy and security laws. We each have a responsibility to be aware of and compliant with the laws that apply to Splunk's business. . . . Splunk also expects you to comply with all applicable Splunk policies and guidelines, the local Employee Handbook if/as applicable, and your individual agreements with Splunk. Compliance is everyone's responsibility.

92.     The Company's Code of Conduct states under a section titled, "Act Honestly, Ethically and Lawfully," that Splunk's employees, officer, and board members must "[a]void [c]onflicts of [i]nterest" and that they "have an obligation to always do what's best for Splunk. A conflict of interest can arise if our private interests interfere, or appear to interfere, in any way with the interests of Splunk. We should avoid even the appearance of a conflict of interest."

93.     Furthermore, the Company's Code of Conduct, under a section titled "Conduct Business Fairly, Openly and Responsibly," states the following, in relevant part:

> **Advertise and Market Truthfully**
> Truthfulness is an important component of maintaining integrity. We have a legal and ethical responsibility to ensure that all of our advertising is truthful and not deceptive. We must market Splunk products and services based on their merits. ***We must also have substantiation for any public statements we make about our — or a competitor's — products, services or company.*** This obligation applies to any social media "influencers" or anyone who may endorse Splunk products on social media or otherwise. This is not only required by law but is something we owe to our customers, prospective customers and others.
>
> **Assist With Required Public Communications and Filings**
> Splunk is required to file periodic reports and other documents with regulatory authorities and may make other public communications, such as issuing press releases. ***We are expected to provide complete, accurate, fair and timely information to help Splunk with its reporting and disclosure obligations and public communications. If you believe that***

*any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, notify our Legal Department immediately.*

(Emphasis added.)

94. The Company's Code of Conduct goes on to say, under a section titled "Comply With Insider Trading Restrictions," the following:

> During the course of your work at Splunk, you may have access to business information about Splunk or its third parties that has not been disclosed to the public. If the information is something a reasonable investor would likely consider significant to a decision to buy, sell or hold stock in Splunk, it is considered "material nonpublic information." Buying or selling Splunk or third-party stock while in possession of material nonpublic information, or passing such information along to others so that they may buy or sell stock, is considered illegal insider trading. Insider trading not only violates the Code, it violates the law. Penalties are severe, including termination of employment in accordance with applicable law, monetary fines and even imprisonment. Splunk prescribes trading blackout periods during which all officers, directors and employees of Splunk are prohibited from buying or selling Splunk securities — even if you don't believe you have any material non-public information regarding Splunk. Familiarize yourself with Splunk's Insider Trading Policy. This policy outlines critical information that you must be familiar with prior to trading in Splunk or any of its partners' securities.

95. The Company's Code of Conduct further states that the Company's employees, officers, and directors must "[c]omply [w]ith [o]ther [l]aws" continuing that, "Splunk may be subject to other local, state, or federal rules, regulations, and laws in each of the countries in which we do business. . . .."

96. Moreover, under a section titled "Ensure Financial Integrity and Personal Responsibility," the Code of Conduct states the following, in relevant part:

> Financial integrity, fiscal responsibility and accurate reporting of our financial results and condition are core aspects of corporate professionalism and required by law. Each person at Splunk — not just those in Finance — has a role in making sure that money is appropriately spent, financial records are complete and accurate, internal controls are honored, and that financial statements and other public and regulatory filings and communications are complete, timely and accurate. This matters every time we hire a new vendor, record an expense, enter into a new business contract, or enter into any transactions on Splunk's behalf. To make sure that we get this right, Splunk maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements in every location in which we operate. If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, notify our Legal Department immediately.

* * *

21

Verified Shareholder Derivative Complaint

**Accuracy of Records**

The integrity, reliability, and accuracy in all material respects of Splunk's books, records and financial statements are fundamental to Splunk's continued and future business success. If your job involves the financial recording of our transactions, make sure that you're very familiar with all of the Splunk policies that apply, including our Travel and Expense Policy and Transaction Approval and Signature Authority Policy. No director, officer, or employee may cause Splunk to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, officer, or employee may create any false or artificial documentation or accounting entry for any transaction entered into by Splunk. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets, and transactions on Splunk's books and records, and to bring to the attention of the Audit Committee and Disclosure Committee any material information of which he or she may become aware that affect the disclosures made by Splunk in its public filings or otherwise.

The CEO and each financial officer and employee shall promptly bring to the attention of the Audit Committee and the Disclosure Committee any information he or she may have concerning:

- Significant deficiencies in the design or operation of internal controls which could adversely affect Splunk's ability to record, process, summarize or report financial data

- Any fraud, whether or not material, that involves management or other employees who have a significant role in Splunk's financial reporting, disclosures or internal controls

\* \* \*

**Reporting Financial or Accounting Irregularities**

We should always fully cooperate and never interfere in any way with the auditing of Splunk's financial records. Similarly, we should never falsify any record or account, including time reports, expense accounts and any other Splunk records. We must fully understand and comply with our Policy Regarding Reporting of Accounting and Auditing Matters. Immediately report any suspected misconduct mentioned above or any irregularities relating to financial integrity or fiscal responsibility, no matter how small, to our Finance or Legal Department.

97.     Finally, the Code of Conduct states, "[w]e must all ensure prompt and consistent action regarding potential violations of our Code." The Code of Conduct concludes: "It's impossible to spell out every possible ethical scenario we might face. Instead, we rely on one another's good judgment to do the right thing and uphold a high standard of integrity for Splunk and ourselves. Splunk expects us to be guided by both the letter and the spirit of the Code. . . . If you aren't sure, don't be afraid to ask questions

of your manager, our Legal Department, Finance or Human Resources. And remember ... if you see something that you think isn't right, speak up. We've worked hard to create a great place to work, let's work hard to protect it."

***Corporate Governance Guidelines***

98.     In a section titled, "Role of the Board," the Company's Corporate Governance Guidelines, approved and adopted by the Board, states the following:

> The role of the Board is to oversee the performance of the chief executive officer ("CEO") and other senior management and to assure that the best interests of stockholders are being served. To satisfy this responsibility, the directors are expected to take a proactive approach to their duties and function as active monitors of corporate management. Accordingly, the directors provide oversight in the formulation of the long term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals. In addition, the Board reviews and approves standards and policies to ensure that the Company is committed to achieving its objectives through the maintenance of the highest standards of responsible conduct and ethics and to assure that management carries out their day-to-day operational duties in a competent and ethical manner.
>
> The day-to-day business of the Company is carried out by its employees, managers and officers, under the direction of the CEO and the oversight of the Board, to enhance the long term value of the Company for the benefit of stockholders. The Board and management also recognize that creating long term enterprise value is advanced by considering the interests and concerns of other stakeholders, including the Company's employees, customers, creditors and suppliers as well as the community generally.
>
> The Board understands that effective directors act on an informed basis after thorough inquiry and careful review, appropriate in scope to the magnitude of the matter being considered. The directors know their position requires them to ask probing questions of management and outside advisors. The directors also rely on the advice, reports and opinions of management, counsel and expert advisers. In doing so, the Board evaluates the qualifications of those it relies upon for information and advice and also looks to the processes used by managers and advisors in reaching their recommendations. In addition, the Board has the authority to hire outside advisors at the Company's expense if they feel it is appropriate. Board members will comply with all applicable policies and guidelines of the Company, including without limitation, the Company's Code of Business Conduct and Ethics.

99.     Moreover, the Corporate Governance Guidelines provide, under the section "Code of Conduct, Conflicts of Interests, Disclosures of Related Party Transactions and Complaints Process," in relevant part:

The Nominating and Corporate Governance Committee shall … consider questions of possible conflicts of interest of directors and corporate officers; review actual and potential conflicts of interest (including corporate opportunities) of directors and corporate officers; and approve or prohibit any involvement of such persons in matters that may involve a conflict of interest or corporate opportunity. If an actual or potential conflict of interest arises for a director, the director shall promptly inform the CEO and the Chief Legal Officer (if no such title exists, the highest-ranking attorney employed by the Company). Directors may be asked from time to time to leave a Board meeting when the Board is considering a transaction in which the director (or another organization in which the director is a director or officer) has a financial or other interest.

100.   The Corporate Governance Guidelines go on to say, under a section titled "Confidentiality," in relevant part:

Directors have an obligation to protect and keep confidential all non-public information related to the Company ("Confidential Information") unless and until the Company has authorized public disclosure (or unless otherwise required by law or regulation) whether or not marked as confidential. Confidential Information includes all non-public information entrusted to or obtained by a director by reason of his or her position on the Board, such as information regarding the strategy, business, finances and operations of the Company and third parties, minutes, reports and materials of the Board and its committees, other documents identified as confidential by the Company and all other non-public information provided by the Company. ***Directors may not use Confidential Information for personal benefit or to benefit other persons or entities other than the Company.***

(Emphasis added.)

### The Company's Committee Charters

101.   The Company's Audit Committee Charter provides that the purpose of the Committee is to:

• Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

• Assist the Board in oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the lead independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

• Provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board;

• Oversee the management of risks associated with the Company's financial reporting, accounting and auditing matters; and

• Oversee the adequacy and effectiveness of the Company's enterprise risk management framework.

102.   The Audit Committee Charter goes on to list the responsibilities of the Committee which include, *inter alia*:

• Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management, the lead internal auditor and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings, reports prepared by the internal audit function and the attestations or reports by the independent auditors relating to such disclosure;

* * *

• Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

* * *

• Reviewing Company quarterly earnings press releases for the purpose of ensuring that such press releases and other disclosures properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, reconcile non-GAAP to GAAP information and adequately disclose how such non-GAAP information differs from the comparable GAAP information and ensure that disclosure of such non-GAAP information is not given undue prominence and that such non-GAAP information does not provide a misleading presentation of the Company's results of operations or financial condition, in all cases consistent with applicable disclosure and accounting rules, including without limitation, those of the SEC[.]

103.   The Audit Committee Charter further charged the Committee, concerning "Regulatory Compliance and Other Matters," with the following, in relevant part: "[o]verseeing compliance with the Company's Code of Business Conduct and Ethics;" "[e]stablishing procedures and overseeing compliance for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters, the prompt internal reporting of violations of the Code that could have a significant impact on the Company's financial statements, and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters[;]" and "[r]eviewing and discussing with management, the lead internal auditor and the

independent auditors, the Company's enterprise risk management framework, including policies, and processes around the identification, management, monitoring and mitigation of enterprise-wide risks."

104. The Company's Nominating and Corporate Governance Committee Charter provides that the purpose of the Nominating and Corporate Governance Committee "shall be to review and make recommendations to the Board, as necessary, on matters concerning corporate governance; Board composition; identification, evaluation and nomination of director candidates; Board committees; conflicts of interest; and any related matters required by the applicable laws."

105. Moreover, the Nominating and Corporate Governance Committee Charter lists the Committees responsibilities and duties as including, *inter alia*, "[r]eviewing annually any corporate governance guidelines approved by the Board to ensure that they remain relevant and are being complied with, recommending changes to the Board as necessary;" and "[o]verseeing compliance by the Board and its committees with laws and regulations applicable to subject matter of the Committee's responsibilities under this charter, including those promulgated by the Securities and Exchange Commission and Nasdaq Rules[.]"

106. Finally, with specific reference to "Conflicts of Interest and Compliance," the Nominating and Governance Committee Charter charges the Committee with, in relevant part:

● Considering questions of possible conflicts of interest of Board members and of corporate officers; and

● Reviewing actual and potential conflicts of interest of Board members and corporate officers, other than related party transactions reviewed by the Audit Committee, and approving or prohibiting any involvement of such persons in matters that may involve a conflict of interest or taking of a corporate opportunity.

107. The Individual Defendants violated Splunk's Code of Conduct and the Company's other governance policies by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, and gross mismanagement, and failing to report the same. Moreover, three of the Individual Defendants violated the Company's Code of Conduct and corporate governance by engaging in insider trading. Also

in violation of the Company's Code of Conduct and corporate governance, the Individual Defendants failed to maintain the accuracy of Company records and reports and comply with laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

108.    Founded in October 2003 as a California corporation, Splunk reincorporated in Delaware in May 2006, and had its initial public offering in April 2012. Splunk is now a Delaware company headquartered in California that specializes in developing and selling data analysis software for use by business enterprises. By its own description, the Company is on a "mission is to make data accessible, usable and valuable to everyone in an organization." The Company has nearly over 19,400 customers including more than ninety of the Fortune 100 Companies. The company has a variety of software packages to fit its customers varied needs, but its flagship product is Splunk Enterprise, "a real-time data platform, comprised of collection, indexing, search, reporting, analysis, alerting, monitoring and data management capabilities."

109.    According to its annual report filed with the SEC on Form 10-K on March 26, 2020 (the "2020 10-K"), "[h]istorically [Splunk] generated a majority of [its] revenues from perpetual license agreements, whereby [it] generally recognize[d] the license fee portion of the arrangement upfront, assuming all revenue recognition criteria are satisfied." However, the Company's business model has "shifted rapidly to primarily offering term licenses and cloud subscription agreements, as well as increased annual invoicing and decreased multi-year upfront invoicing," and the Company expects that "this transition will continue." Accordingly, the Company "discontinued offering new perpetual licenses effective November 1, 2019."

110.    Some of Splunk's customers, including a number of Splunk's largest and most critical customers, had these perpetual licenses and did not want to shift to more costly, in the long-run, recurring term licenses or cloud subscriptions, understandably preferring the now nonexistent perpetual option.

111.    Throughout the Relevant Period, Individual Defendants made, and caused the Company to make, false and misleading statements which failed to disclose the negative effect this change in pricing

model was having, and would likely continue to have, on customer renewals and, in turn, the Company's overall financial performance.

**False and Misleading Statements**

***August 26, 2020 Press Release and Earnings Call***

112.    On August 26, 2020, the Company released its financial results for the fiscal period ended July 31, 2020 and announced guidance for the fiscal period ended October 31, 2020. The press release projected that "***[t]otal revenues are expected to be between $600 million and $630 million***" and that "[n]on-GAAP operating margin is expected to be between 2% and 5%." (Emphasis added.) Moreover, the press release highlighted the following statements issued by Defendants Merritt and Child:

> "Splunk's cloud business continues to accelerate, now representing more than half of our software bookings in the quarter – a major milestone in our cloud journey," Merritt continued. "I'm very proud of our team, strong execution and continued momentum as we look forward to revealing our line-up of trendsetting product innovations at .conf20."

> "Splunk's rapid transformation to the cloud has enabled us to reach key milestones ahead of schedule. Cloud ARR growth accelerated to 89%, or $568 Million, far exceeding our expectations. We also now have nearly 400 customers with ARR in excess of $1 million as more and more businesses embrace our cloud platform," said Jason Child, chief financial officer, Splunk. "Our customers want the flexibility to transition to cloud, and with our diligent planning, we've continued to advance our mission to remove the barriers between data and action."[6]

113.    On the same day, August 26, 2020, the Company held an earnings call for investors, on which Defendant Merritt boasted that "[m]any of the purchasing trends we saw in Q1 continued or accelerated in Q2." Defendant Child added that:

> Turning to guidance. It's important to highlight that the fundamentals of the business remains strong, and we're confident in our ability to deliver continued high growth over the long term. ***Given current visibility, we are maintaining our total ARR growth targets of mid-40% this year and a 3-year CAGR of 40% through FY '23.***[7]

(Emphasis added.)

---

[6] ARR stands for "Annual Recurring Revenue" which would include revenue from subscriptions.
[7] CAGR stands for "Compound Annual Growth Rate" and is a mean annual growth rate for a period of time longer than one year (here the period is, as stated, three years).

*September 3, 2020 Quarterly Report*

114.    On September 3, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended July 31, 2020 (the "2Q21 10-Q"). It was signed by Defendant Child and contained certifications pursuant to Rules 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Merritt and Child attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

115.    The 2Q21 10-Q contained the following statements under the heading, "Controls and Procedures," in relevant part:

**Evaluation of Disclosure Controls and Procedures**

***Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of July 31, 2020.*** The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. ***Based on the evaluation of our disclosure controls and procedures as of July 31, 2020, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the period covered by this Quarterly Report on Form 10-Q that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

*September 24, 2020 Press Release*

116.   On September 24, 2020, the Company issued a press release which noted, in relevant part, that:

> Susan St. Ledger, who joined Splunk in 2016 and has served as president, Worldwide Field Operations, since October 2017, has decided to leave Splunk. She has accepted a leadership position at another technology organization. St. Ledger plans to start with her new company, a Splunk partner, in February 2021.
>
> "On behalf of the entire Splunk team, I'd like to extend my gratitude to Susan for her exceptional impact at Splunk," Mr. Merritt added. "Susan has been instrumental in revolutionizing our go-to-market capabilities and positioning our team for success as we execute on our next phase of growth and continue to drive value for our customers. We wish her all the best in her future endeavors."

117.   Additionally, a current report signed by Defendant Child and filed with the SEC on Form 8-K on the same day, September 24, 2020, reported the following about Susan St. Ledger's departure:

> On September 21, 2020, Susan St. Ledger informed Splunk Inc. (the "Company") of her decision to step down from her duties as the Company's President, Worldwide Field Operations. Ms. St. Ledger will act as an advisor to the Chief Executive Officer until the end of the Company's fiscal year, January 31, 2021, after which time Ms. St. Ledger will leave the Company.

Neither the September 24, 2020 press release nor the September 24, 2020 current report provided a further explanation for her decision to leave the Company.

*October 21, 2020 Conference with Analysts and Investors*

118.   On October 21, 2020, only ten days prior to the end of the third fiscal quarter 2021, Splunk held a digital conference for analysts and investors as part of its greater ".conf20" event, *i.e.,* its annual user conference. During the conference, Defendants Merritt and Child stood by the earlier guidance provided on August 26, 2020. Defendant Merritt stated in relevant part:

> [B]y the end of this year, we'll have reached our fiscal '23 goal, nearly 2 years early. And our customers are increasingly committing to bigger deals, as you can see in the tally of customers with ARR over $1 million.
>
> * * *
>
> Given the importance of ARR and using that as a prime comparison, ***Splunk is growing faster, actually much faster than the household name cloud software players when they're at our stage***. At the end of Q2 with our ARR, just short of $2 billion, Splunk grew at 50% year-over-year. And as I said earlier, that was our seventh quarter of at least 50%

growth. That means this block is growing faster than ServiceNow at $2 billion, faster than Salesforce at $2 billion and faster than Workday at $2 billion.

(Emphasis added.)

119.     Defendant Child added during the conference that:

Our transformation has made our financials complicated, and I'm excited to bring some clarity to you today and make the most recent progress on our financials clearer. And most importantly, to make clear why we are so excited about both our near-term and long-term future growth prospects and our ability to generate meaningful cash flow from operations.

* * *

Moving on to ARR. I first want to take a moment to dig a little deeper into our ARR numbers published up until this point and shine a light on some of the components of ARR. We dug into the numbers to determine 2 things that I think might be helpful for you.

First, we quantified the tailwind to ARR attributable to our shift away from perpetual and renewable software. Perpetual contracts, which fell to only 1% of software bookings by the end of FY '20, only generated ARR from their maintenance streams, whereas term and cloud contract value is fully counted in ARR.

As we've been asked many times, how much of an impact the shift away from perpetual has had on our ARR numbers, we decided to quantify this for you today. No more mystery, it's all laid out here for you.

Second, we quantified the tailwind impact from the acquisition of SignalFx. This one shouldn't be a surprise. We told you in Q3 of the last year that SignalFx had a 300 basis point tailwind to total ARR. However, any benefit received from SignalFx completely disappears beginning this quarter as we lapped the date of the acquisition.

And here's the critical takeaway. By the end of Q4, we estimate that the tailwind from the shift from perpetual falls to less than 1%. So looking forward, *we are reiterating our 40% compounded annual growth rate target for ARR from FY '20 through '23. It should be clear now why we remained confident in these targets given growth tailwinds that I described earlier.*

(Emphasis added.)

120.     Addressing the Company's growth, Defendant Child stated that of the "4 biggest drivers of growth," the first was "*the significant and growing customer renewal base.*" (Emphasis added.) Defendant Child emphasized this by stating: "[s]o yes, we're still sticking to the $1 billion cash flow target for '23. My hope is that the slide would kind of provide a little more context and hopefully help you understand why we feel good about that. . . . So yes, we're definitely sticking to that target."

121.    Speaking of the Company's largest customer accounts, Defendant Child touted the fact that "[f]or our larger customers, we're adding particular value across the expanded data volumes and infrastructures," and claimed that Splunk had "been successful with growing those relationships and offering new areas of value over time." Defendant Child continued:

> Let's now move on to the cloud and why our shift to being cloud-first reinforces our confidence in hitting our growth targets. First, we want to level set for you what our renewal base looks like over the next couple of years. As we shifted away from selling perpetual software licenses and ramped up our renewable mix to reach 99% of all software bookings by Q4 of last year, we've created an accelerated renewal base that you can see ramps up sharply over the next 3 years.
>
> Through the end of FY '20, our term and cloud contracts had an average duration of approximately 3 years. So as we anniversary the contract renewal date for this renewable software base, you can see how much the contract value on an ARR basis is up for renewal in any given year. ***This is what fuels our confidence in our long-term growth. Every one of these contracts up for renewal is an opportunity for us to grow***.

(Emphasis added.)

122.    The statements in ¶¶ 112–121 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Splunk was facing difficulty in obtaining contract renewals due to customer dissatisfaction, particularly from large customers, with a newly-implemented price plan; (2) as part of this customer dissatisfaction, several of the Company's largest customers in fact did not renew their contracts with Splunk; (3) due to the foregoing, Splunk was trailing the Company's stated financial goals and could not meet the financial guidance that it had issued to investors; (4) therefore, during the Relevant Period, when the statements at issue were made, there was no reasonable basis to support the statements touting the Company's financial results and providing an optimistic outlook for the Company's fiscal quarter ended October 31, 2020; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Splunk's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

123.    On December 2, 2020, after the market had closed, Splunk issued a press release announcing the Company's financial results for the fiscal period ended October 31, 2020. The results fell

well short of the guidance issued by the Company and particularly touted by Defendants Merritt and Child, despite them reaffirming that guidance just ten days prior to the end of that fiscal quarter. In contrast to the August 26, 2020 guidance of "[t]otal revenues are expected to be between $600 million and $630 million," the December 2, 2020 press release revealed that "[t]otal revenues were $559 million, down 11% year-over-year." Moreover, in contrast with the August 26, 2020 guidance that "[n]on-GAAP operating margin is expected to be between 2% and 5%," the December 2, 2020 press release revealed that non-GAAP operating margin for the quarter was actually *negative* 1.7%.

124.    On an earnings call that same day, December 2, 2020, Defendant Merritt attributed the poor showing to "much lower-than-normal close rate among our largest deals, which caused us to fall short of our bookings target," admitting that the Company's "third quarter did not meet our expectations." Defendant Child similarly stated that "closing rates for several large transactions slowed significantly in the final weeks of the quarter, resulting in total bookings coming in below plan[.]"

125.    On that call, Raimo Lenschow, an analyst from Barclays Bank PLC, asked:

> *Can you just talk a little bit about the deal slippage at the end of the quarter? Like you obviously had your Head of Sales [Susan St. Ledger] leave.* How much of this is execution-related and disruption coming from the changes on the internal side versus the market? And what's kind of confidence gives you that some of this is coming back in Q4? Because it looks like not many other vendors in the space have really talked about that.

(Emphasis added.)

126.    Defendant Merritt answered this question with the following, in relevant part:

> *[W]hen we saw at the end of Q2 just compounded in Q3, which is deals that the exec team at the customer and our own team thought were going through, that in the final hours or days of routing for approval got stopped* by an extraneous group, the CEO or board of directors or CFO. As a context, when we go back and look quarter over quarter, *the top 10 deals that we went into a quarter with, we tend to close seven, eight, or nine of those top 10 deals. This quarter, we wound up closing three.*

(Emphasis added.)

127.    Lenschow followed up by asking about "duration and that customers didn't commit to kind of bigger engagement, longer-term engagement. I'm just looking at your duration, like kind of how do I marry that up? Because that doesn't show anything. That looks all pretty normal there. Like, help me understand that, please."

128.     Defendant Child replied:

Yes. Well, so duration is down because last year, we had an unusually high duration because of an exceptionally strong public sector quarter and specifically, even with a number of beyond three-year deals, and so we didn't see that dynamic this year. So yes, sequentially, duration looks relatively consistent year on year. It's definitely a bigger headwind.

It was down 22% or something like that year on year. But, yes, so I think overall, I would expect duration probably continues to look like it has all year going forward.

129.     Keith Weiss, an analyst from Morgan Stanley, next asked:

I know a lot of investors are going to go to sales execution. You had a change in leadership. Can you help us understand like sort of where the confidence that you have that this isn't an execution issue, this doesn't have to do with the change of leadership, that this was more of a market event than a Splunk event if you will?

130.     To this, Defendant Merritt replied that:

So what we had said when Susan announced her transition was she had three strong leaders. Christian Smith had been leading global sales for the past two-plus years.

Carrie, obviously, as our continuing CMO and John Sabino as our continuing chief customer officer. So from the day in, day out management and everything from pipeline build, overall process flow, customer engagement, it's the same team underneath Susan that's still driving those activities. Just in looking at the progression of this quarter, there was -- the unusual component was the number of our largest deals that, by the way, are still in play. They got pushed into Q4.

That just has never happened before. And so I've been looking -- scrutinizing this in every way possible with the finance team, the sales ops team, the sales field leaders, myself, that the concerns that we had in Q2, that there was is some really aberrant buying behavior happening as -- again, large transactions got scrutiny that in the past seven years or really the past probably 30 years of enterprise software, but the past 37 years here, I've never seen yet that level of scrutiny is the one common thread across a quarter that still delivered 44% ARR growth and 80% cloud revenue growth. So it's still, on a contextual basis, is an impressive growth quarter, but certainly short of both our expectations and our communication of those expectations.

131.     Later, Brent Thill, an analyst from Jeffries LLC, asked Defendant Merritt:

*[B]ack October 21st, you guys spoke to all of us and had pretty strong conviction, reiterated all the numbers.* And I guess that would leave us to assume that, obviously, the sell part pretty hard at the back half and that these deals were effectively probably late stage, meaning that this was not a competitive loss scenario, this was more of a timing scenario. So I just want to confirm post that Analyst Day on the 21st that that's really where

you saw this fall apart? And secondarily, that you don't believe that this was lost to competitors?

(Emphasis added.)

132.    Defendant Merritt answered:

[O]ne of the seven push deals, that was a competitor loss.

* * *

I honestly have never seen a approved deal within an approved budget envelope sponsored by a C-level executive get stalled by an outside party. And so part of the -- let's continue to watch what's happening in the landscape.

We obviously felt confident going into .conf in the Analyst Day on the team's ability to perform this quarter and then had some very, very unusual and unexpected activity occur, at least from our vantage point. . . .

133.    Thill followed up by asking, "And can you confirm if you closed any of those transactions that pushed in Q4 already?" To this Defendant Merritt responded, "I think that we have closed -- yes, we have closed one or two. I have to go back and look specifically. I should have looked at that coming in."

134.    The news contained in these December 2, 2020 disclosures was not well-received by the market. BTIG LLC's analysts wrote that the Company's proffered explanation of their results were "fairly confusing given that most peers in the software space (and particularly in security software) saw relatively strong trends." J.P. Morgan's analysts, too, wrote that they had been "blindsided by the magnitude of too many large deals slipping in the final days of October on the heels of an upbeat analyst day 10 days prior to the quarter close, at which the company reaffirmed guidance and stated that it was excited about near term and long term growth prospects." J.P. Morgan and others downgraded Splunk's stock rating and greatly reduced their target prices.

135.    On this news, the share price of the Company's common stock dropped $47.88, from $205.91 per share at the close of trading on December 2, 2020, to $158.03 per share at the close of trading on December 3, 2020, a drop of approximately 23.3%.

## DAMAGES TO SPLUNK

136.    As a direct and proximate result of the Individual Defendants' conduct, Splunk has lost and expended, and will lose and expend, many millions of dollars.

137.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

139.    As a direct and proximate result of the Individual Defendants' conduct, Splunk has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

140.    Plaintiff brings this action derivatively and for the benefit of Splunk to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Splunk, waste of corporate assets, unjust enrichment, abuse of control, and gross mismanagement, as well as the aiding and abetting thereof; and for contribution under Sections 10(b) and 21D of the Exchange Act.

141.    Splunk is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Splunk. Plaintiff will adequately and fairly represent the interests of Splunk in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

144.    A pre-suit demand on the Board of Splunk is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Merritt, Baack, Boyle, Carges, Connors, Morrison, Newberry, Smith, Steele, and Viswanath, (the "Director-Defendants") and nonparty Dennis L. Via (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to six of eleven Directors who are on the Board at the time this action is commenced.

145.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of the them engaged in insider sales based on material nonpublic information, netting proceeds of over $9.9 million, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

146.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147.    Additional reasons that demand on Defendant Merritt is futile follow. Defendant Merritt has served as the Company's President, CEO, and as a Company director since November 2015. Previously, he served as the Company's Senior Vice President of Field Operations from 2014 to 2015. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Merritt with his principal occupation, and he receives handsome compensation, including $15,710,645 during fiscal year 2020. Defendant Merritt was ultimately responsible for all of the false and misleading statements and omissions that were made, including those he personally made on August 26, 2020, September 24, 2020, and October 21, 2020. Moreover, he signed the SOX certifications for the 2Q21 10-Q despite the false and misleading statements it contained. As a trusted Company director, he conducted

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $9.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Merritt is a defendant in the Securities Class Actions. For these reasons Defendant Merritt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Baack is futile follow. Defendant Baack has served as a Company director since September 2017. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Baack has received and continues to receive substantial compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Baack breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Boyle is futile follow. Defendant Boyle has served as a Company director since August 26, 2020. He also serves as a member of the Audit Committee. Defendant Boyle has received and continues to receive substantial compensation for his services. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Boyle breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.     Additional reasons that demand on Defendant Carges is futile follow. Defendant Carges has served as a Company director since September 2014. He also serves as a member of the Compensation Committee. Defendant Carges has received and continues to receive substantial compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Carges breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.     Additional reasons that demand on Defendant Connors is futile follow. Defendant Connors has served as a Company director since July 2007. He also serves as the Chair of the Audit Committee. Defendant Connors has received and continues to receive substantial compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Connors breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.     Additional reasons that demand on Defendant Morrison is futile follow. Defendant Morrison has served as a Company director since April 2013. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Morrison has received and continues to receive substantial compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Morrison breached her fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Newberry is futile follow. Defendant Newberry has served as a Company director since January 2013. He also serves as the Chair of the Compensation Committee. Defendant Newberry has received and continues to receive substantial compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Newberry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since August 2011 and as the Chairman of the Board since March 2019. He also serves as a member of the Audit Committee. Defendant Smith has received and continues to receive substantial compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Smith received approximately $747,000 in proceeds from his insider sales of Company stock made during the Relevant Period based on material nonpublic information. For these reasons too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Steele is futile follow. Defendant Steele has served as a Company director since September 2017. She also serves as a member of the Compensation Committee. Defendant Steele has received and continues to receive substantial compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Steele breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Viswanath is futile follow. Defendant Viswanath has served as a Company director since March 2019. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Viswanath has received and continues to receive substantial compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Viswanath breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on the Board is futile follow.

158.    The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Child and Defendant Boyle worked simultaneously at Amazon.com, Inc. ("Amazon"). Defendant Child worked in various leadership roles at Amazon from 1999 to 2010, culminating in his being Amazon's Vice President Finance and CFO International; and Defendant Boyle worked there from 2006 to 2020, predominantly as Vice President and CFO of Amazon Web Services Finances and Global IT Infrastructure during his overlapping tenure with Defendant Child. Moreover, eight of the Director-Defendants have collectively served on the Company's Board together for many years. Defendant Connors has served with Defendant Smith for about ten years following Defendant Smith's joining the Board in 2011. Defendants Connors and Smith have served with Defendants Morrison and Newberry for approximately eight years, since the latter two joined the Board in 2013. Those four have served with Defendant Carges for approximately seven years following his joining the Board in 2014. Those five have served and worked with Defendant Merritt in his capacity as

both a director and as CEO for approximately six years, following Defendant Merritt's onboarding in 2015. And these six have worked with Defendants Baack and Steele for about four years following their joining the Board in 2017. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

159.    Defendants Boyle, Connors, Morrison, and Smith (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, the effectiveness of the Company's internal controls, and matters implicating ethical concerns including compliance with the Code of Conduct. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Moreover, they failed to ensure compliance with legal and regulatory requirements and with the Company's own Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

160.    Defendants Baack, Morrison, and Viswanath (the "Nominating and Corporate Governance Committee Defendants") served as members of the Nominating and Corporate Governance Committee at all relevant times. Pursuant to the Company's Nominating and Corporate Governance Committee Charter, the Nominating and Corporate Governance Committee Defendants are responsible for, among other things, reviewing the Corporate Governance Guidelines and ensuring compliance with them, overseeing the Board and ensuring compliance with applicable laws and regulations, reviewing and approving the Company's Code of Conduct, considering any possible conflicts of interests among the officers and directors, and reviewing actual and potential conflicts of interests which arise concerning the Company's officers and directors. The Nominating and Corporate Governance Committee Defendants failed to uphold these responsibilities, allowing the Individual Defendants to violate applicable laws and regulations and the Company's various governance policies including the Corporate Governance Guidelines and the Code

of Conduct. Thus, the Nominating and Corporate Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

161.    In violation of the Code of Conduct, Company policies, and corporate governance, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, as well as the aiding and abetting thereof. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

162.    Splunk has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Splunk any part of the damages Splunk suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

163.    The Individual Defendants' conduct, described herein and summarized above, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

164.    The acts complained of herein constitute violations of fiduciary duties owed by Splunk's officers and directors, and these acts are incapable of ratification.

165.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies

belonging to the stockholders of Splunk. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Splunk, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

166.    If there is no directors' and officers' liability insurance, then the Directors will not cause Splunk to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

167.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

168.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Splunk's business and affairs.

170.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

171.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Splunk.

172.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

173.     In further breach of their fiduciary duties owed to Splunk, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Splunk was facing difficulty in obtaining contract renewals due to customer dissatisfaction, particularly from large customers, with a newly-implemented price plan; (2) as part of this customer dissatisfaction, several of the Company's largest customers in fact did not renew their contracts with Splunk; (3) due to the foregoing, Splunk was trailing the Company's stated financial goals and could not meet the financial guidance that it had issued to investors; (4) therefore, during the Relevant Period, when the statements at issue were made, there was no reasonable basis to support the statements touting the Company's financial results and providing an optimistic outlook for the Company's fiscal quarter ended October 31, 2020; and (5) the Company failed to maintain adequate internal controls.  As a result of the foregoing, Splunk's public statements were materially false and misleading at all relevant times.

174.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

175.     In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

176.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions

were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

177.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

178.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Splunk has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.     Plaintiff on behalf of Splunk has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

181.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Splunk.

183.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading

statements, or received bonuses, stock options, or similar compensation from Splunk that was tied to the performance or artificially inflated valuation of Splunk, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.     Plaintiff, as a shareholder and representative of Splunk, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

185.     Plaintiff on behalf of Splunk has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

186.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Actions), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

188.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

189.     Plaintiff on behalf of Splunk has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

190.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Splunk, for which they are legally responsible.

192.     As a direct and proximate result of the Individual Defendants' abuse of control, Splunk has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Splunk has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

193.     Plaintiff on behalf of Splunk has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Management

194.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Splunk in a manner consistent with the operations of a publicly-held corporation.

196.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Splunk has sustained and will continue to sustain significant damages.

197.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

198.     Plaintiff on behalf of Splunk has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Merritt and Child for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

199.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.     Splunk, along with Defendants Merritt and Child, who are named as defendants in the Securities Class Actions which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws,

the Company's liability will be in whole or in part due to Defendants Merritt's and Child's willful and/or reckless violations of their obligations as officers and/or directors of Splunk.

201.    Defendants Merritt and Child, because of their positions of control and authority as officers and/or directors of Splunk, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Splunk, including the wrongful acts complained of herein and in the Securities Class Actions.

202.    Accordingly, Defendants Merritt and Child are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

203.    As such, Splunk is entitled to receive all appropriate contribution or indemnification from Defendants Merritt and Child.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Splunk, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Splunk;

(c)    Determining and awarding to Splunk the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Splunk and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Splunk and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure

proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Splunk to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Splunk restitution from the Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 15, 2021                     Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:  /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5475
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: DA57CA1E-2CEA-4FC0-9C75-76CE0D9C057A

## **VERIFICATION**

I,   Alex Wolk   am   a   plaintiff   in   the   within   action.
I  have  reviewed   the   allegations   made   in   this   shareholder   derivative
complaint,  know  the  contents   thereof,   and   authorize   its   filing.   To   those   allegations
of   which I   have personal knowledge,  I  believe  those allegations  to  be  true.  As  to  those
allegations  of  which I  do  not  have  personal  knowledge,  I  rely  upon  my  counsel  and  their
investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th
day of _____, 2020.

2/15/2021

DocuSigned by:

*Alex Wolk*

12BABB7E2A5AB472...

Alex Wolk